## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **PAMELA HERNANDEZ,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION NO. 5:07-CV-02007-KOB** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of the Social** | ) |
| **Security Administration,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |
| | ) |
| | ) |

### I.  Introduction

The claimant, Pamela Ann Hernandez, brings this action seeking judicial review of a final decision by the Commissioner of the Social Security Administration ("SSA") that denied her claim for Supplemental Security Income ("SSI") disability benefits under the Social Security Act.

On January 26, 2005, the claimant protectively filed an application for SSI benefits under Title XVI of the Social Security Act, alleging that she became disabled on January 19, 2005, because of a panic disorder with agoraphobia.  The SSA initially denied the claimant's application, and the claimant requested a hearing before an Administrative Law Judge, which was held on October 12, 2006.  (R. 182-209).  In a decision dated November 15, 2006, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act, and  therefore,

was not eligible for Supplemental Security Income Payments.  (R. 13, 22).  That denial became

the final decision of the Commissioner of the SSA when the Appeals Council refused to grant

review.  (R. 5-7, 11). The claimant has exhausted her administrative remedies, and this court has

jurisdiction under 42 U.S.C. § 1383(c)(3).  For the reasons stated below, the decision of the

Commissioner will be REVERSED and REMANDED.

## II. Issues Presented

In this appeal, the claimant argues that the Commissioner erred (1) in implicitly and

improperly rejecting the opinion of her treating physician and further, (2) in improperly applying

the pain standard and discrediting her subjective testimony.[1]

## III. Standard of Review

The standard for reviewing the commissioner's decision is limited.  This court must affirm the

Commissioner's decision if the Commissioner applied the correct legal standards and if his factual

conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129

F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).  "No. .

.presumption of validity attaches to the [Commissioner's] legal conclusions, including

determination of the proper standards to be applied in evaluating claims."  *Walker*, 826 F.2d at

999.  This court does not review the Commissioner's factual determinations *de novo*, but will

affirm those factual determinations that are supported by substantial evidence.  "Substantial

---

[1]  Claimant raises other issues, but because of the disposition of this case, the court need
not address the others.

evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings."  *Walker*, 826 F.2d at 999.  A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but must also view the record in its entirety and take account of evidence that detracts from the evidence on which the ALJ relied.  *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. Legal Standards

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1)  Is the person presently unemployed?

(2)  Is the person's impairment severe?

(3)  Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?

(4)  Is the person unable to perform his or her former occupation?

(5)  Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a

3

> finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520, 416.920.

The law in the Eleventh Circuit is well-established that the Commissioner must accord substantial or considerable weight to the opinions of the treating physician, absent a showing of good cause. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). Examples of circumstances establishing good cause are where the evidence supports a contrary finding (*Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004)), or where the opinion of the treating physician is accompanied by no objective evidence, is wholly conclusory, or is contradicted by that physician's own treatment notes. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991). If the ALJ decides to discount or reject the opinion of the treating physician, he must "clearly articulate" his reasons for doing so. *Phillips*, 357 F.3d at 1241. He must also specify the weight that he gives to different medical opinions and the reasons for the weight given. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

The controlling case law in the Eleventh Circuit regarding the standard used to assess subjective complaints of pain and other subjective symptoms requires "evidence of any underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

4

**V. Facts**

The claimant, aged 34 at the time she applied for disability, claims to suffer from a panic disorder with agoraphobia, from which she allegedly became disabled as of January 19, 2005. Claimant has never held a traditional job.  (R. 192).  She did not graduate from high school and lives with her parents and her two children, each child fathered by illegal immigrants who are no longer a part of  their lives.  (R. 185-86, 188).

The claimant asserts that she began to experience anxiety problems at the age of 15, and has continually suffered from anxiety-related problems since that time.  (R. 196). Historically, she claims that she could control the panic symptoms by only taking trips outside her home accompanied by family or friends and avoiding crowded places; she indicates that she has never been to a movie theater, for example, and experiences a great deal of discomfort when she shops accompanied by another person at crowded places such as Wal-mart.  (R. 155).  She does not drive.  (R. 155, 198, 206).  In the years immediately before she applied for disability benefits, she claims that her symptoms have worsened and her attacks have become more frequent. (R. 155).

 Her first treatment for this problem occurred on January 19, 2005, at the age of 34, when she presented to an emergency room with complaints of chest pain.  (R. 18).  During that emergency room visit, the attending physician performed an electrocardiogram, which revealed no abnormalities, and diagnosed the claimant with chest pain, gastroesophageal reflux disease, anxiety, and urinary tract infection.  (R. 18).  The attending physician prescribed the claimant Xanax, an anti-anxiety agent, which gave the claimant positive results.  (R. 18).

In March of 2005, the claimant filled out daily activities questionnaires indicating that she spent her average day at home and could perform daily activities such as cleaning, cooking, washing dishes, making beds, and sweeping floors  if she takes her Xanax tablets "although it may take me awhile." (R. 112, 114).  Accordingly to the questionnaire, she only shops with assistance one time per month  – and, furthermore, that she only leaves her home approximately one time monthly –  because going to town make her so nervous that she vomits and has stomach problems. (R. 94, 96, 97, 112).  A questionnaire also dated March of 2005 and filled out by a third party named Opal Suddreth indicated that the claimant managed grooming and household chores, but that she did not leave the house except to get groceries and that someone had to drive her to the store. (R.  100).   The third party questionnaire also indicated that the applicant visited with family and friends "as often as she can," but the question and response did not specify whether those visits were at her home or away from it.  (R. 101).

On March 29, 2005, Barry Wood, Ph.D., a psychologist,  performed a one-time consultative examination on the claimant.  (R. 18, 133).  According to Dr. Wood's notes, the claimant reported her disability to include gastric ulcers, a hiatial hernia, generalized anxiety, and panic episodes.  (R. 18).  The claimant arrived punctually for the appointment and was well-groomed.  (R. 18).  Dr. Wood did not observe any gait problems or other motor deficits in the claimant, and reported that her affect was euthymic (normal, non-depressed, and reasonably positive), her mood was somewhat anxious, and she was well-oriented.  (R. 19).   Dr. Wood indicated that the claimant had a Global Assessment of Function ("GAF") score of 65, which is indicative of "some difficulty in social, occupational, or school functioning."  (R. 19, 136); *see*

*also* DSM-IV 34 (4th ed., text revision 2000).  Finding claimant's descriptions of her panic attacks as "somewhat vague," Dr. Wood stated that "it is not clear that she suffers from panic disorder distinct from generalized anxiety;" consequently, his diagnosis was generalized anxiety disorder and a personality disorder.  (R. 19, 135-36).  His report includes no Psychiatric Review Technique.

The claimant presented to the Mental Health Center of North Central Alabama on April 12, 2006, for panic attacks, anxiety, agoraphobia, and depressive mood symptoms.  (R. 19, 162-66).  On May 4, 2006, Molly Oppman, M.S., a therapist, of the Mental Health Center of North Central Alabama, determined that the claimant had a GAF score of 53, which is indicative of moderate difficulty in social, occupational, or school functioning.  (R. 19, 159-161).  At that time, claimant reported having about five anxiety/panic attacks weekly. (R. 159).  Dr. Edward W. Love, a psychiatrist, reviewed and approved her diagnosis of  panic disorder with agoraphobia.  (R. 160).

On May 16, 2006, Dr. Love examined the claimant, and reported that her mood was euthymic, and that her affect appeared appropriate with good range.  (R. 19, 156).  Dr. Love also noted that the claimant had no psychotic symptoms, except the claimant reported she saw a spider at times.  (R. 19, 156).  The claimant's intellect appeared to be in the low average to borderline range based on vocabulary and fund of knowledge, and her judgment and insight appeared to be fair.  (R. 19, 157).  Dr. Love diagnosed the claimant with panic disorder and agoraphobia, somatoform (physical symptoms with a psychological origin) disorder, history of gastroesophageal reflux, hiatial hernia, and possible migraine headaches.  (R. 19, 159-61).  Dr.

Love prescribed the claimant Lexapro, an anti-depressant, and noted that she might need patient assistance to pay for the medication.  (R. 19, 158).

In a report dated May 2, 2005, Dr. Aileen McAlister, an agency consultant,  listed results of a Psychiatric Review Technique finding non-severe impairments in two categories: anxiety-related disorders, and personality disorders.  Under the category of Anxiety-Related Disorders (12.96), she found that although claimant complained of panic attacks three times per day, her daily activities were not significantly restricted  "with no psychiatric treatment" and only short-term use of Xanax.  (R. 142).   The doctor chose not to check the category listed "recurrent severe panic attacks. . . ."  (R. 142).  Under Personality Disorders (12.08), the doctor found "inflexible maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress" evidenced by "persistent disturbances of mood or affect" and "pathological dependence, passivity or aggressivity."  (R. 144).   The doctor further described claimant's disorder as "Personality DO [disorder] NOS [non-specific]."  (R. 144).  With respect to her functional limitations, the doctor listed all limitations in activities of daily living, social functioning and concentration/persistence/pace as "mild" with no episodes of decompensation, and acknowledged no evidence of the presence of "C" criteria. (R. 147-48).  The doctor concluded that claimant's allegations of anxiety attacks were "partially credible" and, while acknowledging a mental impairment, rated it as "not severe," consistent with 65 GAF.  (R. 149).  The record included no corresponding Mental Residual Functioning Capacity assessment form.

On June 13, 2006, the claimant returned to see Dr. Love.  (R. 19).  She reported difficulty being around crowds, particularly in social situations, and also reported some physical problems.

8

(R. 19). Dr. Love described her affect as "slightly anxious," noted her complaints of being uncomfortable in the waiting room, and characterized her problem as "severe social anxiety in combination with the panic attacks." (R. 152). The claimant reported having some side effects from the Lexapro after taking only half a dose, so Dr. Love changed her prescription from Lexapro to Cymbalta, another type of anti-depressant, and Xanax. (R. 19).

Claimant returned to the health clinic once per month from July through August, alternating visits to the psychiatrist with visits to the therapist. On July 11, 2006 and September 5, 2006, she saw Dr. Love, who continued to characterize her problem as "severe social anxiety with panic attacks." (R. 169, 172). In July, he also noted that some of her "numerous somatic (unexplained) complaints" are legitimate medical problems and consequently "would not meet the critieria for somatization disorder (a psychiatric condition marked by multiple medically unexplained, although not intentionally fabricated, symptoms) though she certainly seems to border on it." (R. 172). Along with 30 mg. of Cymbalta daily (to treat major depressive disorder and general anxiety disorder), the doctor also encouraged claimant to take Xanax tablets more frequently: instead of taking one time per day, she should take at least twice and possibly three times a day. (R. 172). In September, Dr. Love noted that she continued to take one-half of her .5 mg. tablets of Xanax twice a day, and that because Cymbalta was working well for her but was a drain on finances, the clinic was attempting to help her obtain it through patient assistance. (R. 169). In the meantime, she would take imipramine (an anti-depressant). (R. 169). In this last doctor's report of record, Dr. Love's diagnoses included panic disorder with agoraphobia; somatoform disorder, NOS; gastroesophageal reflux, hiatal hernia, and possible migraine

headaches.  (R. 169).  In October, claimant did return to the clinic to meet with a therapist, and noted her increased anxiety about the upcoming social security hearing, sometimes escalating to the point that she vomits.  (R. 168).

The ALJ held a hearing on November 12, 2006.  (R. 180).  The claimant testified that she lived with her parents, and that she had never obtained a driver's license because she was "too nervous to drive." (R. 187).  According to the claimant, no public transportation runs near her parents' house because it is in the country.  (R. 205).  The claimant testified that she has suffered from her nervous condition since she was fifteen years old.  (R. 201).  The claimant reported that she attended school until she completed the tenth grade, but was having so many problems with ulcers, nausea, headaches, and anxiety attacks that she quit and never returned, and has never received her GED.  (R. 188, 201).  The claimant testified that she had attended a ten-day job training program at the Tennessee Valley Rehabilitation, a joint state and federal program designed to work with individuals with physical or mental disabilities to train them to work; however, she had never held any other type of job.  (R. 192-3, 195-6, 204).

The claimant testified that she rarely ran errands in public places, because being in public led to panic attacks accompanied by shaking,  vomiting, disorientation, and diarrhea.  (R. 197). She said that she did visit one friend at the friend's home occasionally, and had spent the night there on several occasions, but sometimes suffered bad anxiety attacks while at the friend's home. (R. 197).  The claimant testified that on average, she currently experienced panic attacks four times per week, presumably with medication.  (R. 196).  The claimant reported that she currently took two and a half tablets of Xanax per day, which made her sleepy, and one Cymbalta per day.

(R. 196).  She further testified that her sister home-schools her children, one of which has an anxiety problem,  and that her parents would not keep her children if she worked outside the home. (R. 194, 199-200, 205).

The VE testified at the hearing that if the claimant had panic attacks two to three times a week "resulting in withdrawal," those attacks would preclude employment.  (R. 208).  He further testified that if the claimant's psychological limitations fell in a category of moderate or less, she would have the capacity to perform unskilled work.  (R. 208).  If the claimant was limited to simple one-to-two-step instruction jobs involving no contact with the public, limited contact with co-workers, and low production standards, the VE stated that the claimant could perform several light, unskilled jobs existing in the national economy in large numbers, such as hand bander, laundry folder, and machine cementer.  (R. 208).  However, for those jobs, absenteeism that occurred at a rate of two or more days per month for a prolonged period of eight or nine months would preclude employment.  (R. 208).  Further, if the claimant's prescribed medication caused drowsiness that lasted longer than just a few minutes to the level that she could not maintain attention, concentration, persistence, or pace to task, that drowsiness would preclude employment. (R. 208).

The ALJ determined that the claimant had not engaged in substantial gainful activity since January 19, 2005, the alleged onset date of her disability, and had no past relevant work .  (R. 18, 21).  The ALJ found that the claimant suffered from an anxiety-related disorder and a personality disorder, impairments that together were "severe" within the meaning of the Regulations, but were not "severe" enough to meet or medically equal one of the impairments listed in Appendix 1,

Subpart P, Regulations No. 4.  (R. 18-19).  Specifically, the ALJ concluded that "claimant's mental impairments result in mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace."  (R. 19-20).   Further, the ALJ noted no evidence of episodes of decompensation.  (R. 20).

With respect to claimant's subjective testimony, the ALJ considered the subjective complaints that were consistent with objective medical evidence.  Although claimant's "medically determinable ailments. . . could reasonably be expected to produce the alleged symptoms," the ALJ did not find her "statements concerning the intensity, persistence and limiting effects" to be credible.  (R. 20).  He found her daily activities and the limited medical treatment received to be inconsistent with her alleged symptoms of severe panic syndrome.  (R. 20).  He noted that claimant's children were home-schooled and that her parents would not help with her children if she worked outside the home.  (R. 21).

The ALJ did not state the weight that he gave to Dr. Love's medical findings or those of Dr. Wood.  He did state that he gave "[l]ittle weight" to the opinion of  "the State Agency medical consultant in May 2005" – presumably Dr. McAlister –  that the claimant had mild mental limitations, explaining that this consultant was neither a treating nor an examining physician and further, and "did not have access to more recently submitted medical evidence."  (R. 21).

The ALJ found that  the claimant had the RFC to "perform light work with no more than moderate mental limitations; the claimant would be limited to low production standards and 1 - 2 step instructions, and she should avoid interaction with the public and only have limited

interaction with coworkers." (R. 20). After considering the VE's testimony and the claimant's age, education, work experience, and RFC, the ALJ found that the claimant was capable of performing work that existed in significant numbers in the national economy. (R. 21). The ALJ, therefore, found that the claimant was not disabled under section 16149(a)(3)(A) of the Social Security Act. (R. 22).

## VI. Discussion

### A. The ALJ Erred in Improperly Rejecting the Treating Physician's Opinion

The claimant contends that the ALJ erred in implicitly and improperly rejecting the opinion of her treating physician, Dr. Love, who found that she has a "panic syndrome with agoraphobia."

The law in the Eleventh Circuit is well-established that the Commissioner must accord substantial or considerable weight to the opinions of the treating physician, absent a showing of good cause. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). Examples of circumstances establishing good cause are where the evidence supports a contrary finding (*Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004)), or where the opinion of the treating physician is accompanied by no objective evidence, is wholly conclusory, or is contradicted by that physican's own treatment notes. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991). If the ALJ decides to discount or reject the opinion of the treating physician, he must "clearly articulate" his reasons for doing so. *Phillips*, 357 F.3d at 1241. He must also specify the weight that he gives to different medical opinions and the reasons for the weight given. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

13

In his opinion, the ALJ in the instant case did not specify what weight he gave to the opinions of claimant's treating physician, Dr. Love, or to the consulting physician, Dr. Wood. His failure to do so constitutes error. *See Sharfarz*, 825 F.2d at 279. Because the diagnoses of those two physicians are not consistent with each other, his failure to perform that task inhibits this court's ability to understand the reasons behind the ALJ's rulings and his ultimate decision to deny disability, as explained further below. Curiously, the ALJ does assign one measure of weight to a doctor; he accords "little" weight to the opinion of the State Agency medical consultant who conducted the Psychiatric Review Technique. However, he does not explicitly assign weight to any other doctor's report and does not explain how he – presumably a person with no formal training in psychiatric disorders – came up with his own findings in the areas listed in the Psychiatric Review Technique form that differed from those of the mental health professional.[2]

The ALJ determined, as his second finding of fact, that claimant's severe impairment was "an anxiety-related disorder and a personality disorder." (R. 18). In support of that finding, the ALJ stated that consultant Barry Wood, Ph.D., had noted claimant's assertions of generalized anxiety with panic episodes but had diagnosed her with "generalized anxiety disorder and a personality disorder." The ALJ also acknowledged that her treating physician, Dr. Love, had diagnosed her with, among other things, "panic disorder with agoraphobia."

---

[2] The ALJ found that the "claimant's mental impairments result in mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace." (R. 20). In her Psychiatric Review Technique form, Dr. McAlister, a Psychiatrist, a one-time examining consultant, found only mild impairments in those areas. The ALJ gave little weight to her report. *See* facts listed on page 12. The record does not reflect that Dr. Wood or Dr. Love prepared a PRT form.

The Commissioner argues in part that the those two disorders were not really inconsistent; to the extent the claimant did have a panic disorder, the ALJ's characterization of the "severe" impairment as a generalized anxiety disorder was proper because that general category includes panic disorders with agoraphobia.  While panic disorder with agoraphobia is indeed a subset of the more general category of "anxiety disorders," the diagnoses of Drs. Love and Wood in the instant case are nevertheless inconsistent in an important way.  Dr. Wood acknowledged Dr. Love's diagnosis of "panic disorder with agoraphobia" and, noting what he called claimant's "vague" description of her panic attacks, begged to differ:  "it is not clear that she suffers from panic disorder distinct from generalized anxiety."  (R. 135-36).  In light of Dr. Wood's specific reference to and rejection of Dr. Love's diagnosis, the ALJ's characterization of claimant's mental problems using  Dr. Wood's exact words of a "generalized anxiety disorder and personality disorder" without including "panic disorder" or "agoraphobia," does indeed imply an acceptance of the opinion of Dr. Wood over that of her treating physician without any explanation for rejecting Dr. Love's diagnosis.

Additionally, in section three of the ALJ's report, the ALJ finds that "the claimant has an anxiety-related disorder and personality disorder . . .[and] the record fails to show that the claimant's impairments are attended by any of the findings specified in Section 12.06 (Anxiety-Related Disorders) and 12.08 (Personality Disorders)." (R. 19).   Section 12.06 includes a category for "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week." (R. 142).  In finding that claimant's impairments were not attended by any findings

specified in Section 12.06, the ALJ was finding that claimant did not experience such recurrent severe panic attacks.  To the extent that the ALJ was rejecting a finding of serious panic attacks, the ALJ should have explained how his finding corresponded with the treating physician's finding of a panic disorder.  Further, while the rejection of Dr. Love's opinion is not explicit, it is implicit, and the ALJ failed to state the reason for that rejection, as he was required to do.  *See Phillips*, 357 F.3d at 1240-41.

The Commissioner further argues that the ALJ need not include every impairment in the list of severe impairments.  While that argument may be true in the abstract, in this particular case the elements that the ALJ omits are the specific elements of her anxiety disorder that render her unable to work: her panic episodes and agoraphobia.   For example, the claimant testified that she suffered four panic attacks per week and the VE testified that if she had panic attacks two to three times per week resulting in withdrawal, her condition would preclude employment. To ignore or reject the panic episodes and fear of going out into public is to reject her theory of disability.

The court finds that the ALJ committed error in failing to specify what weight he assigned to the opinions of Drs. Wood and  Love; and in implicitly rejecting the opinion of Dr. Love without providing explicit reasons for doing so.  The court notes, however, that if the ALJ did not reject the opinion of Dr. Love, then he misapplied the pain standard.

**B.  The ALJ Erred in Discrediting Claimant's Subjective Testimony**

The claimant also argues that the ALJ erred in discrediting her subjective testimony about the severity of her panic attacks and agoraphobia.  The Commissioner argues that the ALJ

correctly determined that the claimant's subjective complaints were not credible, and provided explicit reasons for that determination.

When a claimant alleges disability through subjective complaints of pain or other subjective symptoms, the standard for evaluating these symptoms requires "evidence of an underlying medical condition, and either "(1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

In the instant case, claimant's subjective complaints center around her panic attacks and their frequency and severity.  Claimant testified that her panic syndrome and agoraphobia rendered her unable to work, causing her to shake, vomit, experience diarrhea, and become disoriented.   At the time of the hearing she experienced four panic attacks per week.  Because during the time period surrounding her hearing, she was taking Cymbalta and Xanax and rarely left her home, that number of attacks occurred with medication when claimant remained primarily within her home environment.  The VE testified that if the claimant had panic attacks two to three times a week "resulting in withdrawal," those attacks would preclude employment.  (R. 208). Accordingly, the ALJ's full acceptance of claimant's subjective testimony about her panic attacks would result in a finding of disability.   The court must examine the ALJ's application of the pain standard to claimant's subjective complaints to determine whether his rejection of her testimony was proper.

In his opinion, the ALJ found that "claimaint's medically determinable impairments could reasonably be expected to produce the alleged symptoms" but proceeded to find the "intensity, persistence, and limiting effects" claimant asserted not entirely credible.  (R. 20).  However, the ALJ does not specify at this point what her medically determinable impairments are.  He does not state whether he agrees with her treating doctor, Dr. Love, that she has a "panic syndrome with agoraphobia" *or* agrees with Dr. Wood, a one-time consultant who states "it is not clear that she suffers from panic disorder distinct from generalized anxiety." As noted previously, his characterization of her mental condition as a generalized anxiety disorder and a personality disorder would imply that he agrees with Dr. Wood, but he has not shown good cause for rejecting the treating physician's opinion.

If, however,  the ALJ has not properly rejected Dr. Love's findings, then Dr. Love's records are appropriate medical support for claimant's assertions.  Dr. Love's records diagnose her as having a panic disorder with agoraphobia, characterize her social problem as "severe," and reflect that he prescribed medications such as Xanax and Cymbalta to ameliorate her symptoms. (R. 152, 157, 169, 172).   Thus, evidence from claimant's treating physician confirms her claims that she suffers from a severe panic disorder with panic attacks that occur several times per week.

The pain standard, however, is merely a threshold test to determine whether the claimant's subjective testimony should be considered at all.  *See Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992); *see also Mason v. Bowen*, 791 F.2d 1460, 1462 (11th Cir. 1986).  After considering a claimant's complaints of pain, an ALJ "may reject them as not credible." *Marbury*, 957 F.2d at 839.  In determining credibility, the ALJ is required to consider the entire record, not

just that portion that the ALJ believes supports his decision to deny benefits.  *Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986).  If the ALJ decides not to credit such subjective testimony, he or she must articulate explicit and adequate reasons for doing so.  *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

In determining the credibility of the claimant's subjective complaints, the ALJ primarily considered the claimant's daily activities and the frequency of the claimant's attempts to receive medical treatment.  After the ALJ considered the evidence of record, he concluded that "[t]he claimant has described daily activities which are not limited to the extent one would expect given the complaints of disabling symptoms and limitations."  (R. 20).  The ALJ also noted that "[d]espite the claimant's complaints of disabling symptoms, she has not received the type of treatment one would expect."  (R. 20).  After considering the evidence of record, the ALJ concluded that "[t]he claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible."  (R. 20).

The ALJ noted that the claimant's daily activities included taking care of her personal hygiene, preparing and cooking meals, shopping, performing household chores, taking care of her children, helping her children with their schoolwork, talking on the telephone, reading books, and watching television.  To the extent that the ALJ indicates she performs these activities normally – especially those outside the home – he mischaracterizes her activities.  The record indicates that the claimant needs assistance performing her household chores, her nerves interfere with her concentration while performing her household chores, and she sometimes forgets what she is

19

doing in the middle of performing her household chores.   Her ability to watch television depends on her "nerves" at the times, and she only reads children's books to her children.   In any event, these activities are ones claimant performs in the sanctuary of her home, and do not reflect her ability to function in the public situations that give rise to panic attacks and agoraphobia.  The most telling activities are those that she performs outside the home.  She only shops once per month, and she must have someone with her when she shops.  She often experiences panic attacks, vomits, and has diarrhea as a result of her shopping trips.  She rarely leaves the house, and she takes part in no social activities.  She visits one friend, but only rarely, and she often has panic attacks while at the friend's home.

The symptoms associated with agoraphobia typically include, but are not limited to: fear of being in crowded places, fear of being in places where it may be hard to exit, fear of losing control in public places, inability to leave one's house for long periods, fear of being alone, overdependence on others, and a sense of helplessness.[3]  Contrary to the ALJ's findings, the court cannot agree that the claimant's daily or occasional activities are in direct conflict with any of the symptoms typically associated with panic disorders with agoraphobia, and the ALJ provided no specific examples or adequate reasons to support his conclusion.

The court further notes that established Eleventh Circuit law provides that participation in everyday activities of short duration, such as housework or even going fishing, do not disqualify a claimant from receiving disability benefits.  *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). .

---

[3]  http://www.mayoclinic.com/health/agoraphobia/DS00894/DSECTION=symptoms

As stated above, the second reason the ALJ gave for discrediting the claimant's subjective testimony related to the frequency with which she was seeking medical care.  The ALJ contends that the claimant was not receiving medical treatment as frequently as "one would expect" if the claimant was as limited by her symptoms as she claimed.  The claimant admits that she was not getting regular counseling or treatment when she first applied for SSI, but contends that her agoraphobia caused her to visit the doctor infrequently.  The ALJ concluded that the claimant's contention that she did not receive regular psychiatric treatment because of her agoraphobia was not credible in light of her daily activities.  However, as noted above, the ALJ mischaracterized the extent to which the claimant performed her daily activities outside her home environment.  According to the record, the claimant rarely leaves her home, and often experiences panic attacks when she does so.  The doctor's records indicate that she expressed discomfort in his office waiting room.  In light of her treating physician's diagnosis, the claimant's contention that she did not frequently seek medical care because of her agoraphobia is not unreasonable.

The court finds that the ALJ has failed to articulate adequate reasons for rejecting claimant's subjective testimony of frequent panic attacks with agoraphobia.  The ALJ mischaracterized the extent to which the claimant performed her daily activities, and failed to consider the impact of the claimant's agoraphobia on her ability to seek medical care.  Accordingly, substantial evidence does not support the ALJ's decision that her subjective testimony was not credible.

VII. Conclusion

For the reasons stated, the court REVERSES and REMANDS the Commissioner's

decision. The court will enter a separate order consistent with this opinion.

DONE and ORDERED this 23rd day of September, 2009.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE